# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |  |
|---|---|---|
| | : | |
| AUCTION MANAGEMENT | : | |
| SOLUTIONS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:05-CV-0638-RWS |
| | : | |
| ADESA INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| AUCTION MANAGEMENT | : | |
| SOLUTIONS, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 1:05-CV-0639-RWS |
| v. | : | |
| | : | |
| MANHEIM AUCTIONS, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>ORDER</u>

This case comes before the Court for construction of certain disputed

claim terms in U.S. Patent Nos. 6,813,612 ("the '612 Patent") and 5,774,873

("the '873 Patent").  After considering the parties' arguments presented in their briefs and at a hearing, the Court enters the following Order.

## Discussion

I.      **Claim Construction**

A.      **Legal Standard**

Patent infringement analysis involves two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed, and (2) comparing the properly construed claims to the accused device.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996).  The first step–<i>i.e</i>, claim construction–is at issue here.  The construction of patent claim terms is a question of law for the court.  <u>Markman</u>, 52 F.3d at 970-71.  The Court construes the claims in keeping with the following instructions from the United States Court of Appeals for the Federal Circuit.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d

1111, 1115 (Fed. Cir. 2004)).  Thus, "claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" <u>Innova</u>, 381 F.3d at 1116 (quoting <u>Interactive Gift Express, Inc. v. Compuserve, Inc.</u>, 256 F.3d 1323, 1331 (Fed. Cir. 2001)).

Generally, the words of a claim are given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." <u>Phillips</u>, 415 F.3d at 1312-13 (citations omitted).  In some instances, the meaning of a claim term as understood by someone with skill in the art "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." <u>Id.</u> at 1314.  In most instances, however, the court must go further than the readily understood meaning of the words used and look to other sources to aid it in determining the meaning of a particular claim term. <u>Id.</u> These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning

3

relevant scientific principles, the meaning of technical terms, and the state of the art." Id. (quoting Innova, 381 F.3d at 1116).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. First, "the context in which a term is used in the asserted claim can be highly instructive." Id. Moreover, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id.

The claims of a patent, however, are not to be read in isolation. Id. at 1315. "Rather, they are part of 'a fully integrated written instrument' consisting principally of a specification that concludes with the claims." Id. (quoting Markman, 52 F.3d at 978). Because the "claims 'must be read in view of the specification, of which they are a part,'" id. (quoting Markman, 52 F.3d at 979), "the specification 'is always highly relevant to the claim construction analysis'" and many times, it will be dispositive. Id. at 1315 (quoting Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). As a result, the specification "is the single best guide to the meaning of a disputed term." Id. (internal quotations omitted). On occasion, "the specification may reveal a

4

special definition given to a claim term . . . that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs." Id. (citing CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  In other instances, the specification may "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. . . .  In that instance as well, . . . the inventor's intention, as expressed in the specification, is regarded as dispositive."  Id.; see also Golight, Inc. v. Wal-Mart Stores, Inc.,  355 F.3d 1327, 1331 (Fed. Cir. 2004) ("The written description may . . . restrict the scope of the claims if 'the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002))).  It is important to note, however, that while claims must be construed in light of the specification, limitations from the specification are not to be read into the claims in the absence of a clear disavowel of claim scope. Golight, 355 F.3d at 1331.  In short, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the

5

invention will be, in the end, the correct construction." <u>Phillips</u>, 415 F.3d at 1316 (quoting <u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The court should also consider the patent's prosecution history, which consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. <u>Id.</u> at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." <u>Id.</u> (citing <u>Lemelson v. Gen. Mills, Inc</u>., 968 F.2d 1202, 1206 (Fed. Cir. 1992)). However, unlike the specification, the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation . . . ." <u>Id.</u> For that reason, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." <u>Id.</u>

Finally, the court may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." <u>Id.</u> (quoting <u>Markman</u>, 52 F.3d at 980.) In this regard, dictionaries and treatises may provide useful insight into the proper claim construction because they may help the court "to

6

better understand the underlying technology" and "assist the court in determining the meaning of particular terminology to those skilled in the art of the invention." Id. at 1318 (citing Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002)). In particular, "dictionaries, and especially technical dictionaries, . . . have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology." Id. Additionally, expert testimony may be useful to assist the court providing background on the technology at issue, explaining how an invention works, ensuring that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or establishing that a particular term in the patent or the prior art has a particular meaning in the pertinent field. Id.

However, for many reasons, the Federal Circuit has made clear that extrinsic evidence is generally less reliable than the intrinsic record. See id. at 1318-19. For instance, "extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for explaining the patent's scope and meaning." Id. at 1318. Moreover, "extrinsic evidence consisting of expert reports and testimony is

7

generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." Id.; see also id. at 1318-19 (providing additional reasons why extrinsic evidence is less reliable than intrinsic evidence). Thus, while extrinsic evidence may be useful in understanding the proper interpretation of patent claims, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Id. at 1319.

During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." Id. at 1324.

**B.     The '612 Patent**

The following terms of the '612 patent require construction: "auctioneer in control of the auction event" in the preambles of claims 1, 2, and 3; "clerk system" in claim 1; "process auction bids" in claim 1, and "processing auction bids" in claims 2 and 3; "event-driven system" in claim 1, and "performed in accordance with . . . event-only based events" in claim 2; "transmit/transmitting information regarding the acceptance or rejection of the

8

onsite and remote auction bids" in Claims 1 and 3; "operating subject to the occurrence of only non-time based events" in claim 1, and "performed in accordance with only non-time based events" in claim 2; "occurring under the direction of the auctioneer" in claims 1 and 2; "the auctioneer manages the psychology and pace of the auction" in claim 1, and "the auctioneer manages . . . the pace of the auction and the psychology of the auction" in claims 2 and 3; "accepting an auction bid, the auction bid being accepted under the discretionary control of the auctioneer" in claims 2 and 3; "the auctioneer manages the acceptance and rejection of bids" in claims 2 and 3; "real-time video;" and "the live audio and video being received along with the reception of information regarding the an item being auctioned at the live auction site and information regarding acceptance and rejection of onsite and remote auction bids over an IP network" in claim 3.

After considering the evidence in the record, the briefs of the parties, and the argument of counsel, the Court adopts, with varying degrees of discussion, the following constructions.[1]

---

[1]For the parties' convenience, the Court's constructions of the disputed claim terms in the '612 Patent are summarized in Table 1 below.

1.    **"auctioneer in control of the auction event"**

The parties dispute whether the term "auctioneer in control of the auction event" appearing in the preamble to claims 1, 2, and 3 serves as a limitation on the claims, and thus, whether that term must be construed at all.  Manheim and LGB contend that the term serves as a limitation on the claims and should be construed to mean "auctioneer in complete control of all changes in the state of the auction, including which bids are accepted and rejected."  AMS contends that this term is not limiting, and thus needs no construction; or, in the alternative should be construed to mean "an auctioneer is able to exercise authoritative influence over the auction event."

There is no litmus test for determining whether to treat a preamble as limiting the scope of the patent claims.  Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002).  Rather, "a claim preamble has the import that the claim as a whole suggests for it."  Pitney Bowes, Inc. v. Hewlett Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999). Thus, "'whether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'"  Bicon, Inc. v. Straumann Co., 441 F.3d 945, 952 (Fed. Cir. 2006)

10

(quoting <u>Storage Tech. Corp. v. Cisco Sys., Inc.</u>, 329 F.3d 823, 831 (Fed. Cir. 2003)); <u>see also</u> <u>Catalina Mktg.</u>, 289 F.3d at 808 ("Whether to treat a preamble as a limitation is a determination 'resolved on review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" (quoting <u>Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.</u>, 868 F.2d 1251, 1257 (Fed. Cir. 1989))).

In general, "[i]f the body of the claim 'sets out the complete invention,' the preamble is not ordinarily treated as limiting the scope of the claim." <u>Bicon</u>, 441 F.3d at 952.  Similarly, "a preamble simply stating the intended use or purpose of the invention" or "merely extolling benefits or features of the claimed invention" will usually not limit the scope of the claim.  <u>Catalina Mktg.</u>, 289 F.3d at 809; <u>see also</u> <u>On Demand Mach. Corp. v. Ingram Indus., Inc.</u>, 442 F.3d 1331, 1343 (Fed. Cir. 2006) ("[T]he preamble is analyzed to ascertain whether it states a necessary and defining aspect of the invention, or is simply an introduction to the general field of the claim."); <u>Boehringer Ingelheim v. Schering-Plough Corp.</u>, 320 F.3d 1339, 1345 (Fed. Cir. 2003) ("An intended use or purpose usually will not limit the scope of the claim

11

because such statements usually do no more than define a context in which the invention operates.").

Conversely, a preamble will be regarded as limiting if it is "'necessary to give life, meaning, and vitality' to the claim." Catalina Mktg., 289 F.3d at 808 (quoting Pitney Bowes, 182 F.3d at 1305). "That is, if the claim drafter 'chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.'" Bicon, 441 F.3d at 952 (quoting Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 620 (Fed. Cir. 1995)) (emphasis in original). In such situations, "there is no meaningful distinction to be drawn between the claim preamble and the rest of the claim, for only together do they comprise the 'claim.'" Pitney Bowes, 182 F.3d at 1305.

The Federal Circuit has identified several situations in which the preamble will be deemed a limitation. For example, the preamble will generally constitute a limitation where it "recites essential structure that is important to the invention," Catalina Mktg., 289 F.3d at 808, or where it "provides antecedents for ensuing claim terms." Boehringer, 320 F.3d at 1345; see also Pitney Bowes, 182 F.3d at 1309 (finding term in preamble limiting where it is

"intimately meshed with the ensuing language in the claim" and where claim

terms "[could] only be understood in the context of the preamble statement").

Additionally, "preamble language will limit the claim if it recites not merely a

context in which the invention may be used, but the essence of the invention

without which performance of the recited steps is nothing more than an

academic exercise." Boehringer, 320 F.3d at 1345.  Finally, and most relevant

for purposes of the instant patent, the Federal Circuit has recognized that "clear

reliance on the preamble during prosecution to distinguish the claimed

invention from the prior art transforms preamble into a claim limitation because

such reliance indicates use of the preamble to define, in part, the claimed

invention." Catalina Mktg., 289 F.3d at 808-09.

  AMS contends that the preamble term "auctioneer in control of the

auction event" merely states "the purpose of the claimed invention"and that the

term should not be read as a limitation because "the body of each of the '612

patent claims fully recite[s] an invention that achieves the purpose set forth in

the preamble"—*i.e.*, "to allow the auctioneer to remain in control of the

auction."   (AMS Br. at 6-7.)  In contrast, Manheim and LGB contend that AMS

clearly and repeatedly relied on the element of auctioneer control in

distinguishing prior art, and that such reliance renders the preamble term "auctioneer in control" limiting.  (See Manheim Br. at 11-13; LGB Br. at 9-11.) After reviewing the prosecution history of the '612 patent, the Court agrees with Manheim and LGB and concludes that the term "auctioneer in control of the auction event" appearing in the preambles to claims 1, 2, and 3 is a limitation.

The file history reveals that the examiner repeatedly rejected AMS's patent claims as anticipated or obvious in light of two prior art auction systems disclosed in the Friedland and Dinwoodie patents.  In response to the examiner's rejections, AMS clearly and repeatedly relied upon the aspect of auctioneer control to distinguish that prior art.  For example, in response to the examiner's initial § 102(e) rejection as anticipated by Friedland, AMS attempted to distinguish that art, arguing that "the claimed invention is not fully disclosed in Friedland" because "Friedland does not disclose a system that allows the auctioneer to remain in control. . . ."  (Jt. Ex. C. at 526.)  Then, in a section of its response entitled "Auctioneer is in control," AMS went on to argue that "the claimed invention enables the auctioneer to remain in control of

the auctioning event" and that "[t]his aspect of the invention is not described,

suggested or taught by <u>Friedland</u>." (<u>Id.</u>)  AMS continued:

> The auctioneer being in control of the auction event is
> a key element for the integration of remote bidders
> into the live auction.  The auctioneer needs to have
> control over which bids are accepted, which bids are
> rejected, when the bidding is going to be closed, when
> the next lot is put on the block, when the lot is moved
> into a pre-sold state, etc. . . .  For the auctioneer to
> maintain such control, the various events (i.e., the
> transition from a bidding state to a sold state) must be
> conducted under the control of the auctioneer rather
> than some external force.  If such transitions are
> controlled by external events, the auctioneer is
> stripped of some level of control.

(<u>Id.</u>)  Additionally, after pointing out that <u>Friedland</u> disclosed a time-based

system wherein auction events such as state transitions from the pre-bid state to

the sold state can occur totally autonomous of the auctioneer, AMS argued that

"<u>Friedland</u> cannot possibly describe, suggest, or teach the control aspect of the

present invention because it explicitly strips the auctioneer of such control." (<u>Id.</u>

at 528.)  Finally, the examiner allowed AMS's claims over the <u>Friedland</u> and

<u>Dinwoodie</u> patents on the sole ground that the clerk and bid systems claimed in

the '612 Patent operate subject to the occurrence of only non-time based events.

In commenting on the examiner's reasons for allowance, AMS yet again

returned to the aspect of auctioneer control, and again attempted to distinguish

<u>Friedland</u> on this ground, stating:

> It is applicant's position that <u>Friedland</u> et al.'s [sic]
> system does not leave an auctioneer in complete
> control of the auction event.  Allowing the auctioneer
> to remain in complete control of the auction event as
> claimed in the present invention was a technical
> hurdle that <u>Friedland</u> et al. was not able to clear, and
> thus, was not described, suggested, or taught by
> <u>Friedland</u>.

<u>Id.</u> at 616.

This clear and repeated reliance by AMS on the preambles of Claims 1,

2, and 3 to distinguish prior art references on the ground that they did not

"leave[] an auctioneer in control of the auction event" indicates that AMS used

the preamble to define, at least in part, its invention.  Such reliance is sufficient

to render the preambles of those claims limiting.  See <u>Catalina Mktg.</u>, 289 F.3d

at 808-09.

Because the inventors relied on the preambles to distinguish prior art, the

preamble terms serve as limitations on the claims, and thus, must be construed.

Manheim and LGB contend that the term "an auctioneer in control of the

auction event" should be construed to mean "an auctioneer in complete control

16

of all changes in the state of the auction, including which bids are accepted and rejected."  AMS counters that this term should be construed to mean "an auctioneer is able to exercise authoritative influence over the auction event." The Court agrees with Manheim and LGB.

The prosecution history shows that AMS clearly and consistently used the terms "complete control" and "total control" to distinguish the prior art Dinwoodie and Friedland patents.  (See, e.g., id. at 576 (stating that in the prior art system "the auctioneer remains subservient to the system delays and the processor's bid acceptance algorithm and thus is not in complete control of the auction event"); id. at 617 ("the system described in Friedland et al. is unable to leave an auctioneer in complete control of the auction event"); id. at 373 (explaining that Friedland was distinguishable because in that system "the auctioneer was stripped of some measure of control") (emphases added).) Having previously adopted the position its invention was distinguishable from prior art because it allowed an auctioneer to remain in "complete control" of the auction event, AMS may not now, in litigation, adopt a position contrary to that taken before the PTO.  See Torpharm, Inc. v. Ranbaxy Pharms., Inc., 336 F.3d 1322, 1329 (Fed. Cir. 2003).  Accordingly, the Court adopts the definition

17

proposed by Manheim and LGB, and the preamble term "an auctioneer in control of the auction event" shall mean "an auctioneer in complete control of all changes in the state of the auction, including which bids are accepted and rejected."

2.    **"clerk system"**

Claim 1 recites a "clerk system operable to process auction bids." The parties dispute the meaning of the term "clerk system."

The claim term "clerk system" does not have a plain meaning to one of ordinary skill in the art. Therefore, the Court must look to other sources to ascertain its meaning. In the Court's view, the specification provides the guidance needed. As all parties acknowledge, the specification makes clear that the clerk system is software. It further defines the "clerk system" by the functions that it carries out. In the "Summary of Invention," the '612 Patent states that "[t]he Clerk System controls the sequencing of items to be sold through the auction and controls the bidding process . . . for each item to be sold." ('612 patent col. 3, ll. 10-13.) This statement serves to define the claimed "clerk system," and the Court therefore incorporates these functions into its construction of that term. Accordingly, the term "clerk system" shall

18

mean "software to control the sequencing of items to be sold and control the bidding process for each item to be sold."

### 3.   "process/processing auction bids"

Claim 1 describes the clerk system as operable "to process auction bids." Similarly, Claims 2 and 3 describe a method comprising, in part, "processing auction bids."  The term "process auction bids" is not explicitly defined in the patent, however, all parties appear to agree that one reasonably skilled in the art would understand this term to refer to performing operations on bid data. While the plain meaning of this processing limitation is extremely broad and potentially reaches any number of potential operations, all claims of the patent describe "receiving," "accepting," and "transmitting" bids separately from "processing auction bids."  Therefore, these operations must be excluded from the definition of that term.  Accordingly, the Court adopts the following construction:  The term "process auction bids" appearing in Claim 1 shall mean "perform operations on bids other than receiving, accepting, or transmitting bids," the term "processing auction bids" appearing in Claims 2 and 3 shall mean "performing operations on bids other than receiving, accepting, or transmitting bids."

**4.     "information pertaining to the item being auctioned"**

Claim 1 describes a bid system operable to, <u>inter alia</u>, transmit "information pertaining to the item being auctioned."  Similarly, Claims 2 and 3 describe a method comprising, in part, transmitting "information about the item being auctioned" and "information regarding the item being auctioned" respectively.  LGB proposes that these terms should mean "information describing the item being auctioned other than information regarding the acceptance or rejection of bids and the live video of the auction."  AMS does not offer argument on this issue in its briefs, but asserted during argument that the terms of Claims 1, 2, and 3 should mean "facts or data pertaining to the item being auctioned;" "facts or data about the item being auctioned;" and "facts or data regarding the item being auctioned" respectively.

The Court agrees with LGB that these terms must be construed in light of the other claim limitations.  Accordingly, the terms "information pertaining to the item being auctioned" in Claim 1, "information about the item being auctioned" in Claim 2, and "information regarding the item being auctioned" in Claim 3 shall mean "facts or data pertaining to the item being auctioned other

than information regarding the acceptance or rejection of bids and the live audio and video of the auction."

### 5.    "transmit/transmitting information regarding the acceptance and rejection of the onsite and remote auction bids"

The parties dispute the meaning of "transmit/transmitting information regarding the acceptance and rejection of the onsite and remote auction bids" as that term is used in Claims 1 and 3.  AMS proposes that the claim term means simply "transmit[ting] facts or data regarding the acceptance and rejection of bids submitted by onsite and remote auction bidders."  In contrast, Defendants propose that the term be construed to mean "send[ing] four types of information relating to auction bids: (1) information regarding the acceptance of remote bids, (2) information regarding rejection of remote bids, (3) information regarding the acceptance of onsite bids, and (4) information regarding the rejection of onsite bids."

In support of Defendants' argument that this claim term unambiguously refers to the transmission of four types of information, Defendants proffer three basic arguments.  First, defendants argue that the use of the conjunctive in the claim term itself unambiguously requires the transmission of four types of

21

information.  Second, Defendants point to the specification, arguing that in order to "instill[] confidence of all parties . . . in the integrity of the process" ('612 patent col.2, ll 46-52), transmission of four types of information is necessary.  Finally, Defendants note that during prosecution the inventors cancelled claims which employed the disjunctive and described the transmission of information about the acceptance or rejection of bids, and substituted the conjunctive form which eventually issued as Claims 1 and 3. Defendants argue that in light of this change in claim language during prosecution, the Court must give effect to that distinction.

In contrast, AMS argues that Defendants' proposed construction is overly restrictive, and that nothing in the claim language, specification, or prosecution history requires the transmission of four distinct types of information.  The Court agrees.  From the basic grammatical construction of the claim term, the Court sees no reason why four distinct types of information are required, and Defendants do not point out any reason why a single type of information can not relate to both acceptance and rejection of bids.  Accordingly, the term "transmit/transmitting information regarding the acceptance and rejection of the onsite and remote auction bids" shall mean "transmit[ting] facts or data

AO 72A
(Rev.8/82)

regarding the acceptance and rejection of bids submitted by onsite and remote bidders."

**6.      "event-driven system" & "performed in accordance with . . . event-only based events"**

The parties agree that term "event-driven system" appearing in Claim 1 shall mean "computer systems that change states in response to the occurrence of a triggering external event."  The parties similarly agree that the term "performed in accordance with . . . event-only based events" appearing in Claim 2 shall mean "the steps of the method are performed with computer systems that change states only when prompted by the occurrence of a triggering external event."

**7.      "non-time based events"**

After the Markman hearing, the parties conferred regarding the construction of the term "non-time based events" which appears in both Claims 1 and 2.  While they were unable to reach agreement, they now propose identical constructions of this claim term, with the exception that AMS's construction includes language specifying that the term "non-time based

events" excludes the use of delays, buffers, and time windows to control bid

acceptances in order to control the amount of processing.

"The doctrine of prosecution disclaimer precludes patentees from

recapturing through claim interpretation specific meanings disclaimed during

prosecution." SanDisk Corp. v. Memorex Products, Inc., 415 F.3d 1278, 1286

(Fed. Cir. 2005) (quotations and alterations omitted).  Thus, "where the patentee

has unequivocally disavowed a certain meaning to obtain his patent, the

doctrine of prosecution disclaimer attaches and narrows the ordinary meaning

of the claim congruent with the scope of the surrender." Omega Eng'g, Inc. v.

Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir. 2003).  But, an ambiguous

disclaimer does not serve a public notice function.  Therefore, a disclaimer

which is not "clear and unmistakable," but rather which is "amenable to

multiple reasonable interpretations" will not serve to limit the scope of the

claims.  See SanDisk, 415 F.3d at 1287.

The Court finds that AMS's disclaimer was not sufficiently clear and

unambiguous to be read to disclaim delays, buffers, and time windows entirely.

When read in context, the prosecution history reveals that in every instance

where the inventors distinguished their invention from that disclosed in

Dinwoodie, they did so on the basis that Dinwoodie taught the use of a "predetermined delay" to establish a "bidding acceptance window of time" in order to "control[] subsequent bid acceptances to prevent system overruns." (J. Ex. C. at 571, 572.) This is no less true for the statement relied upon by Defendants. (See id. at 572 (quoting Dinwoodie as stating: "In this manner, processor 26 controls subsequent bid acceptances to prevent an overrunning of system 10," and pointing out that the use of such "delays, buffers and time windows" was common in the field to control system throughput). The fact that the inventors mentioned buffers on a single occasion in reference to common techniques in the industry does not change this conclusion. Buffers were not disclosed by Dinwoodie and thus, disclaiming buffers was unnecessary to distinguish that art. Therefore, a disclaimer of buffers was not required in order to obtain claim allowance, and any mention of buffers was sufficiently ambiguous to avoid a finding of prosecution disclaimer.

Accordingly, for the above stated reasons, the Court construes "non-time based events" to mean "changing states when prompted by events that are not based on time and excluding the use of delays, buffers and time windows to control bid acceptances in order to control the amount of processing."

25

**8.   "occurring under the direction of the auctioneer"**

The parties dispute the meaning of the term "occurring under the direction of the auctioneer" appearing in Claims 1 and 2.  When read in context with the language of the remainder of this claim, and in view of the inventors' extensive efforts to differentiate the control aspect of their invention from that of time-based systems discussed above, the occurrence of non-time based events must occur under the complete control of the auctioneer.  Therefore, the term "occurring under the direction of the auctioneer" shall mean "occurring under the complete control of the auctioneer."

**9.   "the auctioneer manages the psychology and pace of the auction" / "the auctioneer manages the . . . the pace of the auction and the psychology of the auction"**

The parties dispute the meaning of the term "the auctioneer manages the psychology and pace of the auction."  The Court has considered Manheim's proposed definition, and concludes that it is untenable in light of the specification and prosecution history.  The Court therefore adopts the definition proposed by AMS and LGB, and concludes that the term "the auctioneer manages the psychology and pace of the auction" in claim 1 shall mean "the auctioneer uses a variety of techniques to exert influence over the emotion,

26

enthusiasm, and excitement of remote and onsite bidders and over the speed of bidding to play bidders off each other so that they are more likely to bid on auction items and make larger bids."

**10.   "accepting an auction bid, the auction bid being accepted under the discretionary control of the auctioneer"**

After the Markman hearing, the parties submitted revised proposed constructions for this term, differing only in whether, as Defendants contend, the "control" exercised by the auctioneer must be "complete."  This claim term shall mean "auction bid being accepted under the complete control of the auctioneer."

**11.   "the auctioneer manages the acceptance and rejection of bids"**

The term "the auctioneer manages the acceptance and rejection of bids" appearing in claims 2 and 3 shall mean "the auctioneer has complete control over which bids are accepted and rejected."

**12.   "real-time video"**

The parties dispute the meaning of the term "real-time video" as that term appears in Claim 3.  The parties propose substantially identical constructions with one exception.  Defendants posit that the term should mean "non-buffered

AO 72A
(Rev.8/82)

video transmitted and displayed to the remote users without perceived delay between the events as they occur and the events depicted in the video," while AMS urges the Court to exclude the "non-buffered" limitation.

The specification clearly states that the video must be non-buffered. First, the patent abstract states that the invention comprises, in part, "an audio/video system for streaming instantaneous and buffer-free live audio and video data from a live auction site to one or more remote auction bidders. . . ." Second, in the Summary of Invention, the patent states that the "present invention removes the buffering without sacrificing quality" ('612 Patent col. 3, ll. 5-6); describes the "two overarching design elements that firmly define and delineate the unique nature of the A/V System 100: connectionless and non-buffered performance;" and clarifies that the "A/V System 100 uses connectionless, non-buffered designs." In view of these clear statements in the specification, the Court finds that the term "real-time video" shall mean "non-buffered video transmitted and displayed to the remote users without perceived delay between the events as they occur and the events depicted in the video."

**13.   "the live audio and video being received along with the reception of information regarding the an item being auctioned at the live auction site and information regarding acceptance**

**and rejection of onsite and remote auction bids over an IP network"**

AMS proposes this claim term should mean "live audio and video received concurrently at a remote location with auction item information such as characteristics of the auction item and status of bids over one or more ports associated with an IP address."  The Court finds no basis to support AMS's proposed definition in either the '612 Patent or its prosecution history, and finds the testimony of AMS's expert on this point unconvincing.  The Court therefore adopts the definition proposed by Manheim, and this term as it appears in claim 3 shall mean "audio and video streams travel on the same channel as the data stream containing information about the item being auctioned and information about the acceptance and rejection of bids."

**C.    The '873 Patent**

The following claim terms of the '873 patent require construction: "host computer network" in claim 1; "database server" in claim 1; "selected portions of the auction data" in claim 1; "user commands" in claim 1; "means to send user commands to the host computer network" in claim 1; "means to receive and display on the video monitor" in claim 1; "a communications

network electronically linking the computer workstations to the host computer network" in claim 1; "user application modules" in claim 1; "command options selectable by the user to generate the user commands" in claim 1; "auction data" in claim 1; "sale calendar module" in claim 1; "to search the auction data and to display on the video monitors at the workstations a list of one or more auctions by date, by location, and by vehicle sale type" in claim 1; "vehicle sale type" in claim 1; "electronic auction module" in claim 1; "historical sales information" in claim 4; "market reports routine" in claim 4; "vehicle detail information" in claim 6; "vehicle condition grade" in claim 6; "sale catalog review routine" in claim 6; "search the auction data" in claim 6.

After considering the evidence in the record, the briefs of the parties, and the arguments of counsel, the Court adopts the following constructions.[2]

### 1.    "host computer network"

The term "host computer network" in claim 1 shall mean "a network having attached thereto one or more remote access servers providing

---

[2]For the parties' convenience, the Court's constructions of the disputed claim term in the '873 Patent are summarized in Table 2 below.

AO 72A
(Rev.8/82)

command-response services to computers connecting to the network from remote locations."

### 2.      "database server"

The parties dispute the meaning of the term"database server" as that term is used in claim 1.  Manheim argues that "database server" should mean "a computer or program that responds to commands from a client that contains data."  This definition is too broad, and would plainly encompass much more than the "database server" claimed.  Moreover, it appears in conflict with the declaration of Manheim's expert, who stated that "database server" is a term well known to those of ordinary skill in the art, and means "[a] network node, or station, dedicated to storing and providing access to a shared database." (Bailey Decl. ¶ 21 (quoting Computer Dictionary (3d ed. 1997) at 129).)

AMS and BidSoft contend that the term should be construed to mean "relational database software implemented on a computer," and offer two bases in the intrinsic record to support their construction.  First, they note that the claim language itself supports this reading because the ability to "select," "locate" and "organize" data as claimed implies a functionality inherent to relational database systems.  (See Alexander Decl. ¶ 67; '873 patent, col. 11, ll

31

15-21.)  Second, they contend that this reading is supported by the specification, which states in the Summary of the Invention that the "system of the present invention" includes a "[a]n SQL server attached to the host network contain[ing] a relational database of auction information."  ('873 patent, col. 2, ll. 8-10.)

Manheim counters that the definition proposed by AMS and BidSoft improperly reads a limitation into the claim from the preferred embodiment, and argues that their interpretation of the claim language as requiring a relational database is nothing more than an unsupported assertion.  (See Manheim Resp. Br. [381-1] at 19-20.)  Additionally, Manheim argues that there is nothing in the specification which indicates a clear disavowel or disclaimer of database servers other than relational database servers.  (See id. at 17-19.)

Contrary to Manheim's position that the interpretation of the claim language offered by AMS and Bidsoft is nothing more than a "bald assertion," Dr. Alexander stated in his declaration:

> claim 1, clause (d) provides:
>
> command options selectable by the user to generate the user commands, whereby the <u>selected portions of the auction data</u> stored on the host computer network

> <u>are located, organized, and transmitted</u> over the
> communications network to a workstation in response
> to one or more particular user commands
>
> See '873 patent at col. 11, ll. 15-21 (emphasis added).
>
> The use of terminology relating to "selected portions
> of the auction data" being "located and organized"
> indicates that a software program running on a
> computer on the host network is capable of record
> selection and the manipulation of data contained
> within files.  It implies functionality such as that
> found in a relational database, and rules out more
> trivial database forms such as simple file servers,
> which are incapable of this form of such behavior in
> their native form.

(Alexander Decl. ¶ 67.)  However, to say that something implies a functionality

found in relational databases, is not to say that this functionality is limited to

relational databases.  To be sure, a relational database may be ideally suited for

the task.  Indeed, this would explain why the preferred embodiment discloses a

relational database.  But, simply because the patentee chose to disclose the ideal

means for practicing the invention does not mean that the scope of the patent is

so limited.

Because the Court can neither conclude that the patentee chose to define

"database" as a relational database, nor that the claim language *requires* the use

33

of a relational database, the court declines to adopt AMS and BidSoft's proposed definition of "database server." Therefore the Court cannot accept AMS's proposed construction. Similarly, because the definition proffered by Manheim is far too broad, and would plainly encompass much more than the "database server" claimed, the Court cannot accept Manheim's proposed definition. Instead, the Court adopts a plain meaning definition, wherein the term "database server" in claim 1 shall mean a "network device dedicated to storing and providing access to a shared database."

### 3.      "selected portions of the auction data"

The parties agree that the term "selected portions of the auction data" in claim 1 means "any subset of the auction data."

### 4.      "user commands"

Manheim contends that the term "user commands" is a well-known term that one of reasonable skill in the art would understand to mean "instructions by a user, such as key presses or mouse clicks, that cause a computer to carry out an action." Thus, according to Manheim, the term "user commands" should be construed to mean "user actions such as key presses or mouse clicks." AMS and Bidsoft, on the other hand, argue that "user commands" means

"instructions, issued by a user remotely connected to the host computer network, causing selected portions of the auction data stored on the host computer network to be located, organized, and transmitted over the communication network to the user's workstation."

The Court agrees with AMS and Bidsoft that Manheim's construction must be rejected.  As they correctly point out, claim 1 recites

> a set of user application modules which cause the computer workstations and host computer network to generate on the video monitors a series of command options selectable by the user to generate the user commands, whereby the selected portions of the auction data stored on the host computer network are located, organized, and transmitted over the communications network to a workstation in response to one or more particular user commands and are displayed on the video monitors.

('873 patent col. 11, ll. 12-22.)  Manheim's expert stated that a user would select a "command option" through user actions such as mouse clicks or key strokes. (Bailey Dep. [377-8] at 196.)  Thus, Manheim's proposed construction would mean, in essence, command options selectable by the user by pressing a key or clicking a mouse to generate key presses or mouse clicks.  As this is nonsensical, the Court rejects Manheim's proposed construction.  See ASM

AO 72A
(Rev.8/82)

America, Inc. v. Genus, Inc., 401 F.3d 1340, 1346-47 (Fed. Cir. 2005)

(rejecting proposed claim construction where it would result in nonsensical

construction of the claim as a whole).

In contrast, the Court finds AMS and Bidsoft's construction to be

consistent with the claim language and specification of '873 patent.  For

example, claim 1(a)  recites a "database server that electronically stores and

organizes auction data and that retrieves and transmits selected portions of the

auction data in response to user commands."  ('873 patent col. 10, l. 66-col. 11,

l. 3.)   Similarly, claim 1(d) recites "a set of user application modules . . . to

generate user commands, whereby the selected portions of the auction data

stored on the host computer network are located, organized, and transmitted

over the communications network to a workstation in response to one or more

particular user commands. . . ."  (Id., col. 11, ll. 12-22.)  Thus, as AMS and

Bidsoft correctly explain, "user commands" must be operable to cause selected

portions of the auction data to be located, organized and transmitted to the user

workstation.  Moreover, the construction proposed by AMS and Bidsoft is in

consonance with both the remainder of the claim language and the expert

testimony. (See id. at col. 11, ll. 6-7 (claiming "means to send user commands

to the host computer network"); Bailey Dec.. [379-8] at ¶ 24 (explaining that " 'User commands' are also well-known in the art and would commonly be understood by one of ordinary skill in the art to be *instructions*, issued by the user, that cause an action to be carried out.").)

Accordingly, the Court concludes that the term "user commands" in claim 1 shall mean "instructions issued by a remote computer, causing selected portions of the auction data stored on the host computer network to be located, organized, and transmitted over the communications network to the user's workstation."

### 5.    Means-Plus-Function Limitations

Claim 1(b) recites:

> computer workstations placed at locations associated
> with each user, the computer workstations including a
> video monitor, means to send user commands to the
> host computer network, and means to receive and
> display on the video monitor auction data retrieved
> and transmitted from the host computer network

('873 patent col. 11, ll. 4-9.)  A substantial dispute exists as to the proper construction of both "means-plus-function" claim terms.

AO 72A
(Rev.8/82)

"A means-plus-function limitation contemplated by 35 U.S.C. § 112, ¶ 6 recites a function to be performed rather than definite structure or materials for performing that function." Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc., 145 F.3d 1303, 1307 (Fed. Cir. 1998). The first step in construing a means-plus-function limitation is "to identify the function explicitly recited in the claim." Asyst Technologies, Inc. v. Empak, Inc., 268 F.3d 1364, 1369 (Fed. Cir. 2001). The second step is to "identify the corresponding structure set forth in the written description that performs the function set forth in the claim" as understood by one skilled in the art. Id.; Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374, 1379 (Fed. Cir. 1999). "If there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite." Biomedino, LLC v. Waters Technologies Corp., 490 F.3d 946, 950 (Fed. Cir. 2007).

A function cannot be adopted which is different from that "explicitly recited in the claim." Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999). In exchange for the ability of a patentee to use means expressions under § 112 and avoid reciting in a claim "all possible

structures that could be used as means," the patentee's claim must be limited to

"the means specified in the written description and equivalents thereof."

Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205,

1211 (Fed. Cir. 2003); see also Chiuminatta Concrete Concepts, Inc., 145 F.3d

at 1307-08.  Accordingly, the function is found by looking at the claim

language itself while the structure is found by looking to the specification.

The corresponding structure must "actually perform the recited function,

not merely enable the pertinent structure to operate as intended. . . ." Asyst

Technologies, Inc., 268 F.3d at 1371.  Structure is only "corresponding

structure" if it is clearly linked in the specification or prosecution history to the

function recited.  Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.,

248 F.3d 1303, 1311 (Fed. Cir. 2001).

> While the specification must contain structure linked
> to claimed means, this is not a high bar: all one needs
> to do in order to obtain the benefit of § 112, ¶ 6 is to
> recite some structure corresponding to the means in
> the specification, as the statute states, so that one can
> readily ascertain what the claim means and comply
> with the particularity requirement of § 112, ¶ 2.
> Additionally, interpretation of what is disclosed in the
> specification must be made in light of the knowledge
> of one skilled in the art. Thus, in order for a
> means-plus-function claim to be valid under § 112,

> the corresponding structure of the limitation "must be
> disclosed in the written description in such a manner
> that one skilled in the art will know and understand
> what structure corresponds to the means limitation.

Biomedino, 490 F.3d at 950 (quotations, citations, and alterations omitted).

     (a)    *"means to send user commands to the host computer network"*

As it relates to this claim term, the parties agree about several things. First, the parties agree that the function explicitly recited in the claim is "sending user commands to the host computer network."  Second, the parties agree that the corresponding structure must be software resident on the user workstation, and that it is the "communications parameters", which are incorporated within the user applications, that enable the workstation to send user commands.  (See AMS Br. at 14; Manheim Br. at 13.)  Finally, the parties agree that the term "communications parameters" does not have an ordinary meaning to one of ordinary skill in the art, and thus, one must look to the intrinsic record to determine what "communications parameters" means as that term is used in the '873 Patent.  (See AMS Br. at 14; Bailey Depo. at 216-217.) The parties disagree, however, about what "communications parameters"

correspond to the function of sending user commands to the host computer network.

Manheim proposes that the corresponding structure is simply "a user application (such as a browser) written to function in a MS Windows environment and an ability to communicate to a modem or similar device."  The Court cannot accept this definition.  As an initial matter, the Court finds no support for the inclusion of a browser, as a browser is not disclosed anywhere in the '873 Patent.  Additionally, as explained above, it is undisputed that it is the "communications parameters" incorporated into the user applications resident on the user workstation which enable the application to send user commands to the host computer network.  Yet Manheim's proposed definition fails to identify the communications parameters necessary to perform this function.  Instead, Manheim merely states that the application must have "the ability to communicate with a modem or similar device."  But, this merely restates the function rather than identifies the structure that performs it.  And finally, because the term "communications parameters" has no plain meaning to one of ordinary skill in the art, Manheim's proposed definition fails to identify a structure which would be understood by one of ordinary skill in the art as

41

adequate to perform the function of sending user commands to the host computer network.  The Court therefore rejects Manheim's proposed definition.

Having concluded that Manheim's proposed definition is untenable, the Court turns to consider whether the definition proffered by AMS correctly identifies the structure corresponding the recited function.  The Court concludes that, at least in part, it does.  As AMS persuasively argues, the term "communications parameters" as used in the '873 Patent can only be understood by reference to the communications protocols identified in the patent specification.  And the only communications protocol identified in the '873 Patent is X.25.  Therefore, the application resident on the user work station must be capable of transmitting user commands from the user workstation to the host computer network using the X.25 protocol.  Additionally, the patent teaches that "data packets are routed to and from the users's [sic] PC workstation through a remote access server."  ('873 Patent, Summary of Invention col. 2, ll. 6-8.)  Therefore, the communications parameters must be capable of establishing a connection to a RAS computer using the X.25 network protocol.

42

The Court declines, however, to construe this term as requiring that communications be asynchronous, or that the connection be maintained through a PAD.  With respect to the requirement that communications be asynchronous, this requirement was not included in AMS's initial claim construction, and in any event, is not necessary to the identified function of sending user commands. When that requirement is excluded, the necessity for communications parameters which establish and maintain an X.25 circuit through a PAD similarly becomes superfluous.  As AMS's expert acknowledges, PADs are not a necessary part of every X.25 network but rather only become necessary when asynchronous communications are utilized.  (Alexander Decl. ¶ 41.)  Because the Court declines to construe this term as requiring communications parameters capable of employing asynchronous communications, it similarly declines to require that the communications parameters be capable of establishing and maintaining an X.25 circuit through a PAD.

In view of the foregoing, the Court concludes that the means-plus-function term "means to send user commands to the host computer network" shall mean "user workstation software utilizing communication parameters to provide a connection to a RAS computer using the X.25 network protocol."

43

(b)   *"means to receive and display on the video monitor"*

As with the "means to send user commands" claim term, Manheim proposes that the term "means to receive and display on the video monitor auction data retrieved and transmitted from the host computer network" should mean "a user application (such as a browser) written to function in an MS Windows environment and an ability to communicate with a modem or similar device."  For the reasons set forth above in the Court's discussion of the "means to send user commands" claim term, however, the Court finds the definition proposed by Manheim inadequate.  Additionally, for the reasons set forth above, the Court adopts the following definition: the term "means to receive and display on the video monitor auction data retrieved and transmitted from the host computer network" shall mean "user workstation software utilizing communications parameters to provide a connection to a RAS computer using the X.25 network protocol and interpret and display the auction data retrieved and transmitted from the host computer network."

**6.      "a communications network electronically linking the computer workstations to the host computer network"**

44

The parties similarly disagree about the meaning of the term "a communications network electronically linking the computer workstations to the host computer network" in claim 1.  Without question, the plain meaning of the term communications network to one of ordinary skill in the art is consistent with the definition proposed by Manheim—namely, an "electronic connection between the users' computers and the host computer network that enables data transfer."  (See Manheim Resp. Br. at 20; AMS Resp. Br. at 28.)  But, this term must be construed in light of the claims as a whole.  Given the Court's conclusion, supra, that the "means to send user commands" and the "means to receive and display . . . auction data retrieved and transmitted from the host computer network" require communications parameters capable of employing the X.25 network protocol, the Court adopts AMS's proposed definition.  Therefore the term "a communications network electronically linking the computer workstations to the host computer network" shall mean "hardware and software forming an electronic connection between the users' computers and the host computer network that enables data transfer via the X.25 protocol."

### 7.     "user application modules"

The parties agree that the term "user application modules" in claim 1 shall mean "portions of a program that perform a particular task or implement a particular abstract data type."

### 8.     "command options selectable by the user to generate the user commands"

The parties agree that the term "command options selectable by the user to generate the user commands" in claim 1 shall mean "command buttons or other user interface objects by which a user can select a user command."

### 9.     "auction data"

The term "auction data" in claim 1 shall mean "data relating to an auction."

### 10.    "sale calendar module which allows the user to search the auction data and to display on the video monitors at the workstations a list of one or more auctions by date, by location, and by vehicle sale type"

Claim 1(e) recites a "sale calendar module which allows the user to search the auction data and to display on the video monitors at the workstations a list of one or more auctions by date, by location, and by vehicle sale type." ('873 patent col. 11, ll. 27-30.)  AMS and BidSoft propose the following

definition: "a computer program for searching a motor vehicle auction database and viewing data concerning future vehicle auctions; the program allowing the user to search the auction database for vehicle auctions matching a user-selected parameter, wherein the parameters available to the user must include date, location, and vehicle sale type."  Under Manheim's proposed construction, the term would mean "a portion of a program that performs the particular tasks of allowing users to search the auction data and displaying a list of auctions sorted by date, location or vehicle sale type."

The first issue the Court must resolve with respect to this term is whether the phrase "by date, by location, and by vehicle sale type" modifies "search the auction data," as AMS and BidSoft argue, or "display" as Manheim contends. It is Manheim's position that the claim phrase represents two distinct elements related to the sale calendar module: first, the user must be able search the auction data, and second, the results must be displayed by date, location, and sale type.  Thus, according to Manheim, the phrase "by date, by location, and by vehicle sale type," modifies only "to display on the video monitors at the workstations a list of one or more auctions," and not "search the auction data." In contrast, AMS and BidSoft argue that while the claim term as it appears is

ambiguous in this regard, the inventors resolved this ambiguity during prosecution by expressly stating that the sales calendar module "allow[s] the user to search a 'calendar' of different auction sales by location, date, and/or sale type."  ('873 patent file history, Oct. 17, 1997 Response and Amendment [377-7] at 5.)

Upon review of the intrinsic evidence, the Court agrees, at least for the most part, with AMS and BidSoft.  The inventors' statements during prosecution make clear that users must be able to search the auction data by the claimed parameters.  (See id.. ("Applicant believes that the term 'sale calendar' is appropriate for the functions performed by this module: allowing the user to search a 'calendar' of different auction sales by location, date, and/or sale type."); id. at 7 ("[T]he system of Applicant's Claim 1 includes a 'sale calendar' module that allows the user to search for different auctions by date and location.").)  This understanding of the claim language is confirmed by the specification.  Notably, the flow chart diagrams showing the sequence of events associated with the sale calendar module clearly indicate that the search parameter—e.g., sale type or location—is selected by the user to generate an SQL query which is then transmitted to the server which returns results

48

matching the selected parameter—that is, to search the auction data—which are then displayed on the video monitors.  (See '873 patent, Figs. 2A1 to 2E.)

Accordingly, the Court agrees with AMS and BidSoft that the term "by date, location, and vehicle sale type" modifies "search the auction data" and adopts the following construction: "a portion of a program which performs the particular tasks of allowing the user to query a motor vehicle auction database for auctions matching a user-selected parameter, wherein the parameters available to the user must include date, location, and vehicle sale type, and displaying the results of that search on the video monitors at the user workstations."

### 11.    "vehicle sale type"

The parties dispute the meaning of the term "vehicle sale type" as that term appears in claim 1.  AMS and Bidsoft contend that the term should mean "categories of auction events including regular sale, manufacturer sale, and heavy duty/truck sale."  In support of their construction, they argue that the patentee served as its own lexicographer by clearly defining "vehicle sale type" in the specification and prosecution history, and as such, the inventors' definition should be applied.  Manheim argues that one skilled in the art would

understand this term to mean "a type of vehicle sale," and that AMS and Bidsoft's construction improperly imports a limitation from the specification and prosecution history.

It is well-settled that "a patentee is free to be his own lexicographer," Markman, 52 F.3d at 979, and thus may define claim terms in ways that differ from the common understanding of those skilled in the art.  E.g., Renishaw PLC, 158 F.3d at 1249.  However, in order for a patentee's definition of a claim term to be applied over the plain and ordinary meaning to one skilled in the art, the patentee must clearly set forth an explicit definition of the claim term which could differ in scope from that which would be afforded by its ordinary meaning.  See Markman, 52 F.3d at 979 (explaining that the "caveat" to the rule affording the patentee the ability to specially define claim terms is that "any special definition given to a word must be clearly defined in the specification"); Mycogen Plant Sci. v. Monsanto Co., 243 F.3d 1316, 1327 (Fed. Cir. 2001) ("[A] patentee is free to be his own lexicographer, so long as the special definition of a term is made explicit in the patent specification or file history."). When the patentee chooses to act has his or her own lexicographer "by providing an explicit definition in the specification for a claim term . . . the

50

definition selected by the patent applicant controls." <u>Renishaw PLC</u>, 158 F.3d at 1249.

The PTO initially rejected previously submitted claim 2 which included the term "sale calendar means" under 35 U.S.C. § 112, ¶ 2, stating: "It appears from the specification that the sales calendar application allows the user to search the database for desired vehicles based on user criteria." ('873 patent file history, May 9, 1997 Office Action [377-6] ¶ 2.)  In response, the applicants cancelled claim 2, but amended claim 1 to incorporate the limitations of claim 2, and explained that the term "vehicle sale type" referred to the type of sale, rather than the type of vehicle.  ('873 patent file history, Oct. 17, 1997 Response and Amendment [377-7] at 5.)  Specifically, the applicants stated:

> This module does not perform the function of searching by <u>vehicle</u> type; that is carried out in the Stock Locator module.  The <u>sale</u> type refers to whether the auction is a "regular" sale (see Fig. 2-B), a "manufacturer" sale (see Fig. 2-C), or a "heavy duty/truck" sale (see Fig. 2-D)[.]

(<u>Id.</u>)

In the Court's view, this statement does not clearly and unambiguously offer a special definition for this claim term and explain how it would differ

51

from its ordinary meaning.  Rather, the statement, viewed as a whole, merely clarifies that the term "vehicle sale type" refers to the type of sale, and does not encompass a search for particular vehicles—a function performed by the stock locator module.  While the applicants did refer to examples of certain sale types described in the specification, the Court views this statement merely as a clarifying reference, and not an explicit definition of the claim term.  Therefore, the Court concludes that this statement is not sufficient to overcome the "heavy presumption" in favor of applying the ordinary meaning to a claim term.  Apple Computer, Inc. v. Articulate Systems, Inc., 234 F.3d 14, 21 n.5 (Fed. Cir. 2000) ("[A] patentee must deliberately and clearly point out how these terms differ from the conventional understanding.").  Accordingly, the term "vehicle sale type" in claim 1 shall mean "a type of vehicle sale which may include regular sale, manufacturer sale, and heavy duty/truck sale."

### 12.    "electronic auction module"

The parties agree that the term "electronic auction module" in claim 1 shall mean "a portion of a program which permits the user to participate in the bidding process during an Electronic Motor Vehicle Auction."

**13.    "historical sales information"**

The parties agree that the term "historical sales information" in claim 4 shall mean "information about prior sales including the sale prices for different vehicle types that have been sold at an auction in the system."

**14.    "market reports routine"**

The parties dispute the meaning of the term "market reports routine" as that term appears in claim 4.  AMS and Bidsoft argue that the term should mean "a user application residing on the user's workstation which provides information about prior sales, including the sale prices for different vehicle types that have been sold at auction in the system."  Manheim contends that the term should mean "a section of code that can be invoked or executed within a program that performs the particular task of allowing the user to search and view auction data such as recent vehicle sale prices for a specific motor vehicle auction location[] or geographic region."  In the Court's view, neither proposed construction is appropriate.

Claim 4, which is dependent of claim 1, specifically claims: "The system of claim 1 wherein the auction data includes historical sales information."  As set forth above, the parties agree that the term "historical sales information"

means "information about prior sales including the sale prices for different vehicle types that have been sold at an auction in the system." Thus, as AMS and Bidsoft correctly explain, the plain language of claim 4 requires that the "market reports routine" allow the user to search the auction data and display at the workstation the "historical auction data." As such, the market reports routine, at a minimum, must allow the user to search the auction data and display at the workstation "information about prior sales including the sale prices for different vehicle types that have been sold at an auction in the system."

That issue resolved, the primary remaining dispute appears to be whether the "market reports routine" must be "a user application residing on the user's workstation" as AMS and Bidsoft contend. The Court concludes that it does not. As Manheim correctly points out, claim 4 makes clear that the market reports routine is included within the set of user application modules. While the patent clearly discloses that the user application modules are resident on the user workstations, the Court finds no basis for requiring that they be so located. Notably, the term "user application module" appearing in claim 1 is also in dispute. Neither party proposed a construction of that term which required that

54

the modules be resident on the user workstation; rather, the parties agreed that the term means only "portions of a program that perform[] a particular task or implement[] a particular abstract data type."  Because "the same terms appearing in different claims in the same patent . . . should have the same meaning 'unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims,'" see Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1328 (Fed. Cir. 2006) (quoting Fin Control Sys. Pty. Ltd. v. OAM, Inc., 265 F.3d 1311, 1318 (Fed. Cir. 2001)); Phillips, 415 F.3d at 1314 ("[C]laim terms are normally used consistently throughout the patent."), and because the Court perceives nothing in the specification or file history which clearly indicates that this claim term should be construed differently, the Court declines to require that the market reports routine consist of a stand-alone application resident on the user workstation.

In view of the foregoing, the Court concludes that the term "market reports routine" in claim 4 shall mean a "portion of a program that performs the particular task of allowing the user to search the auction data and display on the

user workstation information about prior sales including the sale prices for

different vehicle types that have been sold at an auction in the system."

### 15.   "vehicle detail information"

The parties agree that the term "vehicle detail information" in claim 6

shall mean "information about minute and distinct aspects of the vehicle.  Such

information may include options, status, dates, charges, notes, and condition

information."

### 16.   "vehicle condition grade"

AMS and BidSoft contend that the term "vehicle condition grade" is

incapable of being construed, although they offer no argument on this point.

Manheim contends that the term should mean "a rating based on the condition

of the vehicle."

"A claim is indefinite if its legal scope is not clear enough that a person

of ordinary skill in the art could determine whether a particular composition

infringes or not." Geneva Pharm., Inc. v. Glaxosmithkline PLC, 349 F.3d 1373,

1384 (Fed. Cir. 2003).  That is to say, a claim is indefinite if it " 'is insolubly

ambiguous, and no narrowing construction can properly be adopted.'"

Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1383 (Fed. Cir. 2005)

(quoting Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001)); see also Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367, 1371 (Fed. Cir. 2004) ("We have held that a claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, *i.e.*, it is not insolubly ambiguous, it is not invalid for indefiniteness.").

     While the parties have not directed the Court to anything in the intrinsic record which would shed light on the proper meaning for this term, Manheim's proposed definition derives from the testimony of its expert, Dr. Bailey, who stated that "one of ordinary skill in the art would understand [this term] to mean a rating based on the condition of the vehicle."  (Bailey Decl. ¶ 69.)  In view of this testimony as to the understanding of one reasonably skilled in the art, and being presented with nothing to the contrary from AMS and BidSoft, the Court concludes that this term is not so "insolubly ambiguous" as to be rendered indefinite.  As such, the term "vehicle condition grade" in claim 6 shall mean "a rating of the condition of the vehicle."

### 17.    "sale catalog review routine"

AMS and BidSoft contend that the term "sale catalog review routine" appearing in claim 6 should mean "a user application residing on the user's PC workstation allowing the user to search the vehicle condition information and to display the results of the search on the video monitor of the user's PC workstation."  Manheim counters that the term should mean "a portion of an application that allows users to display a list of sale dates and sale inventory associated with a selected motor vehicle auction."  Much as with the term "market reports routine," the Court finds none of the proposed constructions appropriate.

Claim 6, which is dependent of claim 1, claims "The system of claim 1 wherein the auction data includes vehicle detail information . . . and the set of user application modules includes a sale catalog review routine whereby the user can search the auction data and display the vehicle detail information." Therefore, the plain language of claim 6 requires that the user be able to search the auction data and display on the user's workstation "the vehicle detail information."  The parties agree that "vehicle detail information" means "information about minute and distinct aspects of the vehicle," and that '[s]uch

information may include options, status, dates, charges, notes, and condition information." Therefore, the "sale catalog review routine" must be capable of searching and displaying this information.

With respect to AMS and BidSoft's proposed construction which would require that the "sale catalog review routine" be a "user application residing on the user's PC workstation," the Court declines to impose such a limitation for the reasons set forth in the Court's discussion of "market reports routine," supra.

In view of the plain language of the claims, the Court concludes that the term "sale catalog review routine" in claim 6 shall mean a "portion of a program that performs the particular task of allowing the user to search the auction data and display on the user workstation information about minute and distinct aspects of the vehicle, where such information may include options, status, dates, charges, notes, and condition information."

**19.   "search the auction data"**

AMS and BidSoft contend that the term "search the auction data" appearing in claim 6 should be construed to mean "query a relational database for vehicle detail information relating to vehicles being auctioned at a user-

selected auction event and displaying on the video monitors vehicle detail information corresponding to the user selected auction event." Manheim argues that the term should mean "a query is made of the auction data."

The primary basis for AMS and BidSoft's construction derives from their construction of the term "database server," which they argued should be construed to mean a relational database server. Having rejected this proposed construction, <u>supra</u>, the Court finds no basis for requiring the "search" to be "a query of a relational database."[3] Accordingly, the term "search the auction data" in claim 6 shall mean "a query is made of the auction data."

**SO ORDERED** this __11th__ day of September, 2007.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

---

[3] The Court notes that the same term appears in claim 1. AMS and BidSoft did not propose a construction for that term which required a query of a relational database. Rather, they proposed that the term "search the auction data" in claim 1 should mean "to query a motor vehicle auction database matching a user-selected parameter. . . ." AMS and BidSoft point to nothing in the claims, specification, or file history which would indicate that the same term appearing in both claim 1 and claim 6 should be construed differently, and the Court therefore adopts a construction of the term "search the auction data" which is consistent throughout the '873 patent.

60

**TABLE 1.**

| The '612 Patent | |
|---|---|
| Claim Term | Construction |
| "auctioneer in control of the auction event" in the preambles of Claims 1, 2, and 3 | "an auctioneer in control of the auction event" shall mean "an auctioneer in complete control of all changes in the state of the auction, including which bids are accepted and rejected" |
| "clerk system" in Claim 1 | "software to control the sequencing of items to be sold and control the bidding process for each item to be sold" |
| "process auction bids" in Claim 1, | "perform operations on bids other than receiving, accepting, or transmitting bids" |
| "processing auction bids" in Claims 2 and 3 | "performing operations on bids other than receiving, accepting, or transmitting bids" |
| "information pertaining to the item being auctioned" in Claim 1<br><br>"information about the item being auctioned" in Claim 2<br><br>"information regarding the item being auctioned" in Claim 3 | "facts or data pertaining to the item being auctioned other than information regarding the acceptance or rejection of bids and the live audio and video of the auction" |
| "transmit/transmitting information regarding the acceptance or rejection of the onsite and remote auction bids" | "transmit[ting] facts or data regarding the acceptance and rejection of bids by onsite and remote bidders" |

AO 72A
(Rev.8/82)

| | |
|---|---|
| "event-driven system" in Claim 1 | "computer systems that change states in response to the occurrence of a triggering external event" |
| "performed in accordance with . . . event-only based events" in Claim 2 | "the steps of the method performed with computer systems that change states only when prompted by the occurrence of a triggering external event" |
| "non-time based events" | "changing states when prompted by events that are not based on time and excluding the use of delays, buffers, and time windows to control bid acceptances in order to control the amount of processing" |
| "occurring under the direction of the auctioneer" in Claims 1 and 2 | "occurring under the complete control of the auctioneer" |
| "the auctioneer manages the psychology and pace of the auction" in Claim 1

"the auctioneer manages . . . the pace of the auction and the psychology of the auction" in Claims 2 and 3 | "the auctioneer uses a variety of techniques to exert influence over the emotion, enthusiasm, and excitement of remote and onsite bidders and over the speed of bidding to play bidders off each other so that they are more likely to bid on auction items and make larger bids" |
| "accepting an auction bid, the auction bid being accepted under the discretionary control of the auctioneer" in Claims 2 and 3 | "auction bid being accepted under the complete control of the auctioneer" |
| "the auctioneer manages the acceptance and rejection of bids" in Claims 2 and 3 | "the auctioneer has complete control over which bids are accepted and rejected" |

62

| | |
|---|---|
| "real-time video" | "non-buffered video transmitted and displayed to the remote users without perceived delay between the events as they occur and the events depicted in the video" |
| "the live audio and video being received along with the reception of information regarding the an item being auctioned at the live auction site and information regarding acceptance and rejection of onsite and remote auction bids over an IP network" in Claim 3 | "audio and video streams travel on the same channel as the data stream containing information about the item being auctioned and information about the acceptance and rejection of bids" |

AO 72A
(Rev.8/82)

**TABLE 2.**

| The '873 Patent | |
|---|---|
| Claim Term | Construction |
| "host computer network" in Claim 1 | "a network having attached thereto one or more remote access servers providing command-response services to computers connecting to the network from remote locations" |
| "database server" in Claim 1 | "network device dedicated to storing and providing access to a shared database" |
| "selected portions of the auction data" in Claim 1 | "any subset of the auction data" |
| "user commands" in Claim 1 | "instructions issued by a remote computer, causing selected portions of the auction data stored on the host computer network to be located, organized, and transmitted over the communications network to the user's workstation" |
| "means to send user commands to the host computer network" in Claim 1 | "user workstation software utilizing communication parameters to provide a connection to a RAS computer using the X.25 network protocol" |

AO 72A
(Rev.8/82)

| | |
|---|---|
| "means to receive and display on the video monitor" in Claim 1 | "user workstation software utilizing communications parameters to provide a connection to a RAS computer using the X.25 network protocol and interpret and display the auction data retrieved and transmitted from the host computer network" |
| "a communications network electronically linking the computer workstations to the host computer network" in Claim 1 | "hardware and software forming an electronic connection between the users' computers and the host computer network that enables data transfer via the X.25 protocol" |
| "user application modules" in Claim 1 | "portions of a program that perform a particular task or implement a particular abstract data type" |
| "command options selectable by the user to generate the user commands" in Claim 1 | "command buttons or other user interface objects by which a user can select a user command" |
| "auction data" in Claim 1 | "data relating to an auction" |
| "sale calendar module which allows the user to search the auction data and to display on the video monitors at the workstations a list of one or more auctions by date, by location, and by vehicle sale type" in Claim 1 | "a portion of a program which performs the particular tasks of allowing the user to query a motor vehicle auction database for auctions matching a user-selected parameter, wherein the parameters available to the user must include date, location, and vehicle sale type, and displaying the results of that search on the video monitors at the user workstations" |
| "vehicle sale type" in Claim 1 | "a type of vehicle sale which may include regular sale, manufacturer sale, and heavy duty/truck sale" |

65

| | |
|---|---|
| "electronic auction module" in Claim 1 | "a portion of a program which permits the user to participate in the bidding process during an Electronic Motor Vehicle Auction" |
| "historical sales information" in Claim 4 | "information about prior sales including the sale prices for different vehicle types that have been sold at an auction in the system" |
| "market reports routine" in Claim 4 | "portion of a program that performs the particular task of allowing the user to search the auction data and display on the user workstation information about prior sales including the sale prices for different vehicle types that have been sold at an auction in the system" |
| "vehicle detail information" in Claim 6 | "information about minute and distinct aspects of the vehicle.  Such information may include options, status, dates, charges, notes, and condition information" |
| "vehicle condition grade" in Claim 6 | "a rating of the condition of the vehicle" |
| "sale catalog review routine" in Claim 6 | "portion of a program that performs the particular task of allowing the user to search the auction data and display on the user workstation information about minute and distinct aspects of the vehicle, where such information may include options, status, dates, charges, notes, and condition information" |

AO 72A
(Rev.8/82)

| "search the auction data" in Claim 6 | "a query is made of the auction data" |
|---|---|